THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:14-cr-306-MHT-WC |
| | ) | |
| JOHN W. MITCHELL | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

Before the court is Defendant's Motion to Dismiss on Grounds of Grand Jury Abuse (Doc. 54), the Government's Response (Doc. 63), and Defendant's Reply (Doc. 68). For the reasons that follow, the undersigned RECOMMENDS that Defendant's motion be DENIED.

Defendant moves the court to dismiss the Indictment on grounds of Grand Jury abuse. Def.'s Mot. (Doc. 54) at 1. He asserts that the Government committed "pervasive and systematic abuse . . . that stripped the Grand Jury of its independence." *Id.* at 4. Specifically, he contends that the abuse he describes was manifested in the Government's "use of leading questions that was, in effect, unsworn testimony of the prosecutor and the repeated references to a matters [sic] and conduct not relevant to the charges in the indictment that severely prejudiced the defendant in the minds of the Grand Jury." *Id.* at 1.

Defendant seeks pretrial dismissal of the Indictment on the basis of alleged prosecutorial misconduct before the grand jury. This is an extraordinary request. "Only

a defect so fundamental that it causes the grand jury no longer to be a grand jury, or the indictment no longer to be an indictment, gives rise to the constitutional right not to be tried." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 802 (1989).  Ordinarily, district courts may not dismiss an indictment unless the error, violation, or misconduct before the grand jury has prejudiced the defendant. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988).  "The prejudicial inquiry must focus on whether any violations had an effect on the grand jury's decision to indict." *Id.* at 263.  Thus, "an indictment should be dismissed only 'if it is established that the violation substantially influenced the grand jury's decision to indict or if there is grave doubt that the decision to indict was free from the substantial influence of such violations.'" *United States v. Pettway*, 129 F. App'x 583, 589 (11th Cir. 2005) (quoting *Bank of Nova Scotia*, 487 U.S. at 256).  Accordingly, apart from establishing actual misconduct before the Grand Jury, Defendant must show that he was prejudiced by the alleged misconduct within the meaning of *Bank of Nova Scotia*.

    Defendant first argues that Government misconduct is apparent from the prosecutor's use of inflammatory remarks and questions.  He asserts that the "Grand Jury was improperly and gratuitously inflamed against Dr. Mitchell by repeated references and questions regarding irrelevant but prejudicial matters."  Def.'s Mot. (Doc. 54) at 4. Specifically, he contends that the Government repeatedly referred to "a medical complication," which the prosecutor erroneously suggested was fatal, of one of Defendant's former patients, a letter sent in 1999 from a hospital administrator

questioning Defendant's truthfulness in patient files, a report reviewing Defendant's patient records from 1999, testimony concerning the number of Defendant's patients, and testimony about a real estate transaction which alienated Defendant's former business partners.  *Id.* at 4-5.  Defendant asserts that the Government's eliciting this evidence and repeated inquiries into these areas with a string of witnesses could have "no other purpose than to prejudice the grand jury against Dr. Mitchell."  *Id.* at 5.

In addition to the Government's repeated forays into purportedly irrelevant and prejudicial matters with its witnesses, Defendant asserts that the Government's misconduct is apparent from its "use of pervasive leading questions."  Def.'s Mot. (Doc. 54) at 36.  Without providing specific examples other than a citation to the entire transcripts of two witnesses before the grand jury, Defendant argues that, "[f]or an AUSA to consistently, repeatedly, and virtually exclusively lead a witness in this manner over all of the critical areas of any case, but especially a highly complex case such as this one, renders the witness' participation in the exercise virtually meaningless."  *Id.*  Thus, he concludes, the Government's "relentless" and "severe" leading questions of its witnesses, "combined with the inflammatory and gratuitous testimony and remarks" described above, sufficiently overwhelmed the grand jury in its intended role as an independent buffer between the Government and Defendant and therefore warrants dismissal of the Indictment.  *Id.* at 36-37.

The undersigned Magistrate Judge does not agree that the prosecutor committed serious misconduct before the grand jury, or otherwise abused the grand jury, to a degree

3

of severity sufficient to warrant dismissal of the Indictment. While the prosecutor indisputably did inquire with witnesses into matters which are not appreciably relevant to the charges in the Indictment or even to health care fraud in general, a reviewing court should not presume to know how or why a prosecutor may assess the potential relevance of evidence during the grand jury's investigation phase, or how the grand jury should be confined during its investigation. This is precisely why the Eleventh Circuit has remarked that, "absent an abuse of the grand jury process, the fact that the grand jury during the course of an investigation may have received evidence not relevant to the allegations in the indictment it eventually returns cannot justify the dismissal of such indictment." *United States v. DiBernardo*, 775 F.2d 1470, 1476 (11th Cir. 1985).

Thus, the prosecutor's actions in erroneously referring to a specific patient's condition in 1999, or introducing into evidence before the grand jury a hospital administrator's letter concerning the hospital's review of the incident involving the patient, as well as evidence of independent reviews of Defendant's patient records occurring over ten years ago, or even evidence about Defendant's real estate dealings, his professional reputation among his peers, and his seemingly acrimonious relationship with his former business partners will not be sufficient to constitute grand jury abuse unless there is substantial doubt that the prosecutor offered such evidence for any purpose other than to poison the grand jury with this information. However, in this case there is ample reason to question whether the prosecutor offered such evidence for exclusively that purpose. In this regard, the Government's assertion is well taken, *see* Gov't's Resp.

(Doc. 63) at 8, that the grand jury could have considered whether some of this evidence supported a charge for a "continuing scheme to commit health care fraud that continued until a date within the five-year limitations period" or that it might simply have considered whether evidence concerning the 1999 patient demonstrated Defendant's propensity—notably, the grand jury is not precluded, unlike a trial jury, from receiving such propensity evidence pursuant to Rule 404(b) of the Federal Rules of Evidence—to engage in the activities for which it did indict him.

    Likewise, the undersigned cannot conclude that the prosecutor's eliciting evidence about Defendant's real estate transaction, which directly and adversely affected some of the witnesses testifying before the grand jury, or about Defendant's reputation among his peers constitutes prosecutorial misconduct or evinces some intent to abuse the grand jury. Even if not likely to be directly relevant to any discrete count in the indictment or any offense which one might imagine as having been actually contemplated by the prosecutor at that time, such evidence could have been important to the grand jurors in contextualizing the testimony of Defendant's former business partners, as their testimony plainly touched on both their opinions about Defendant and his professional tendencies and about standards in the Auburn area and in the larger medical community.  Among other potential benefits, the evidence may have enabled the grand jurors to appreciate whether personal opinions or biases may have influenced the witnesses' testimonies. Rather than being done merely to poison the grand jury, one might just as easily view this as in aid of the grand jury's truth-seeking.  Certainly, a witness's apparent hard feelings

toward the Defendant could be relevant to a grand juror's assessment of the reliability of the witness's testimony.

In addition to the foregoing, Defendant's concern with the prosecutor's so-called "relentless" and "severe" leading of witnesses, which he purports is tantamount to vast quantities of unsworn testimony by the prosecutor, is also overwrought. In general, the practice of leading witnesses before the grand jury is disfavored. Nevertheless, the Eleventh Circuit has remarked that, "[h]owever questionable" such a practice may be, "it must be remembered that a duly-sworn witness actually testified to the factual correctness of all the questions asked him by the prosecutor." *United States v. Brown*, 872 F.2d 385, 387 (11th Cir. 1989). As such, where a witness's testimony indicates that, despite any asserted over-reliance on leading, the sworn witness testified truthfully and independently, Defendant's burden in demonstrating the requisite prejudice is not lessened merely by the presence of leading questioning of witnesses.

The undersigned Magistrate Judge has reviewed the two transcripts provided by Defendant in support of his contention that the prosecutor's leading amounts to prejudicial misconduct. While the prosecutor does indeed frequently ask leading questions of the witnesses, the transcripts do not substantiate any contention that the prosecutor's questioning in fact rendered the "witness' participation in the exercise virtually meaningless," or that it eliminated "the grand jury's ability to function as the 'buffer' or 'referee'" our system contemplates it to be. *See* Def.'s Mot. (Doc. 54) at 36-37. Indeed, the transcripts make clear that, where appropriate, witnesses corrected or

6

clarified the prosecutor's erroneous assumptions reflected in his leading questions,[1] and that on several matters of significance to the grand jury's investigation, especially on matters uniquely within the purview of the witnesses' professional opinion or experience, the prosecutor appropriately asked open-ended questions which invited, and received, lengthy expository answers by the witnesses.[2]  As such, the witnesses' participation in grand jury proceedings could hardly be described as meaningless.  Nor can it fairly be said that the grand jurors were so overwhelmed by the prosecutor's instances of leading questioning that jurors were unable to independently function in their intended role.  In the limited transcripts made available in conjunction with Defendant's motion, it is apparent that grand jurors independently questioned and challenged the witnesses during their testimonies.[3]  On the limited record before the court, the undersigned simply does not find significant evidence that this grand jury was not acting as a grand jury is intended.

---

[1]   *See, e.g.*, Transcript of Dr. W.D. (Doc. 57-2) at 8:7-15; *id.* at 10:7-15; and *id.* at 13:22-14:1.  Indeed, when the prosecutor mistakenly asserted that the patient from 1999 had died as a result of a perforated artery suffered during a procedure administered by Defendant, the witness clarified that he was unaware whether the patient had died, but that the patient had required "emergency cardiac bypass surgery."  *See id.* at 15:10-19.  Defendant has not identified any instance in which a witness failed to correct or clarify an instance of leading questioning where appropriate to ensure that it was the witness, and not the prosecutor, who was testifying.

[2]   *See, e.g.*, Transcript of Dr. W.D. (Doc. 57-2) at 14:22-15:9 (witness asked to explain his notation in records that "cardiac catheterization was unnecessary"); *id.* at 18:9-18 (witness asked to explain "the significance of instructing a nurse to record dissection as compared to perforation in the record"); Transcript of Dr. B.F. (Doc. 57-3) at 8:1-9:4 (witness asked to explain risk created by placing a stent in patient with only 20 percent blockage); *id.* at 13:17-15:17 (witness asked to explain differences between various stents used by cardiologists).

[3]   *See, e.g.*, Transcript of Dr. W.D. (Doc. 57-2) at 29:19-30:6 (grand juror questioning witness about the basis of his present belief that Defendant is "still doing stents at 20 percent" and asking him to "back up those assumptions"); Transcript of Dr. B.F. (Doc. 57-3) at 26:18-21 (grand juror asking witness to clarify terminology used in his earlier testimony); *id.* at 28:21-25 (grand juror asking witness to set aside "personal feelings" for Defendant and discuss Defendant's peers' opinions of Defendant's professional ability); *id.* at 37:3-20 (grand juror querying witness about whether technological improvements in the last eight or nine years have substantially affected the likelihood of mistakenly interpreting imaging).

Ultimately, whether the prosecutor arguably acted with any improper intent or not, Defendant has not sufficiently demonstrated that he was prejudiced by the prosecutor's conduct before the grand jury. Again, this court must determine whether "any violations had an effect on the grand jury's decision to indict." *Bank of Nova Scotia*, 487 U.S. at 263. Only if Defendant can establish "that the violation substantially influenced the grand jury's decision to indict or if there is grave doubt that the decision to indict was free from the substantial influence of such violations" should the court act to dismiss the Indictment in this case. *Id.* at 256. The Government argues that Defendant has not, and cannot, establish the requisite prejudice. To that end, the Government asserts that "the Grand Jury had before it ample unchallenged evidence to establish probable cause[,]" including

> the medical records of the ten patients whose treatment formed the basis of the ten counts alleged in the indictment. These records showed that each patient had received a stent installed by Mitchell despite having coronary arteries that were less than 70 percent blocked. The Grand Jury also heard from numerous cardiologists who testified that generally accepted standards of medical practice at the time Mitchell performed the procedures counseled against installing stents in arteries that were not at least 70 percent blocked and the Grand Jury had the benefit of expert witness findings that the stents alleged in the indictment did not meet the 70 percent blockage requirements.

Gov't's Resp. (Doc. 63) at 14 (citations omitted). Defendant, who is presumably in possession of the ten patients' medical records alluded to by the Government, as well as any expert summaries, and at least some of the testimonies of the cardiologists establishing the 70 percent standard, has not meaningfully challenged the grand jury's probable cause finding as a means of buttressing his contention that the grand jury was

8

unduly influenced by irrelevant and prejudicial information when it decided to indict on the basis of other information before it.  Rather, Defendant only points to witnesses' brief testimonies about the "collateral matters," *United States v. Verbitskaya*, 406 F.3d 1324, 1336 (11th Cir. 2005), he identifies, and appears to conclude that, considered in combination with the prosecutor's leading questioning, the grand jury would not have indicted him without the prosecutor's alleged misconduct.  Because the undersigned simply cannot conclude that the grand jury would not have indicted Defendant in the absence of the evidence and prosecutorial questioning described in Defendant's motion, or even that there is grave doubt whether the grand jury would have done so, the undersigned does not find that Defendant has established prejudice within the meaning of *Bank of Nova Scotia.  See Verbitskaya*, 406 F.3d at 1336; *United States v. Vallejo*, 297 F.3d 1154, 1164-65 (11th Cir. 2002).

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that Defendants' Motion to Dismiss on Grounds of Grand Jury Abuse (Doc. 54) be DENIED.

It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before May 18, 2015.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive, or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); s*ee Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); s*ee also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

Done this 4th day of May, 2015.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE